## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

LEA-MAX CORPORATION,    )
    )
    Plaintiff,    )
    )    Case No.: _____
    v.    )
    )
RAYTHEON TECHNOLOGIES    )
CORPORATION, THE PULLMAN    )
COMPANY, and GOULD    )
ELECTRONICS, INC.,    )
    )
    Defendants.    )

### PLAINTIFF'S COMPLAINT FOR DAMAGES

Plaintiff Lea-Max Corporation ("Lea-Max"), by counsel, for its complaint against defendants Raytheon Technologies Corporation ("Raytheon"), The Pullman Company ("Pullman"), and Gould Electronics, Inc. ("Gould Electronics"), alleges and states:

### THE PARTIES

1.    Lea-Max is a corporation organized under the laws of Indiana having its principal place of business in Indianapolis, Marion County, Indiana, and owning real property located at 1539 (a/k/a 1589) Estella Avenue, New Haven, Allen County, Indiana (the "Property").

2.    Raytheon is a corporation organized under the laws of Delaware having its principal place of business in Arlington, Arlington County, Virginia.

3.    Pullman is a corporation organized under the laws of Delaware having its principal place of business in Park Ridge, Cook County, Illinois.

4.    Gould Electronics is a corporation organized under the laws of Arizona having its principal place of business in Phoenix, Maricopa County, Arizona.

## JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over the parties because the parties conducted business in Indiana and the actions giving rise to this complaint took place in Indiana and caused harm to an Indiana citizen.

6.      This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, and the state-law claims arise from the same common nucleus of operative facts.

7.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2).

## NATURE OF THE CASE

8.      This lawsuit asserts claims under Indiana's Environmental Legal Action Statute, Indiana Code §§ 13-30-9-1 *et seq.* (the "ELA"), the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a)(4)(B) *et seq.* ("CERCLA"), and certain toxic torts for costs incurred and to be incurred by Lea-Max in responding to the release of hazardous substances at the Property that pose a risk to human health and the environment.

## SITE OPERATIONS

9.      Magnavox Government and Industrial ("Magnavox") began operating at the Property in 1944.

10.     Upon taking possession of the Property, Magnavox used the Property for the assembly of radio/signal detection finders.

11.     Magnavox's operations at the Property ceased in 1946.

12.     In 1946, the Cleveland Graphite & Bronze Company purchased the Property.

13.     Upon acquisition of the Property, Cleveland Graphite & Bronze outfitted the Property and an onsite building to produce automotive bearings and bushings and began manufacturing operations at the Property immediately thereafter.

14.     In 1948, Cleveland Graphite & Bronze expanded the building northward, nearly doubling its size from 42,000 square feet to 82,564 square feet.

15.     In 1952, Cleveland Graphite & Bronze changed its name to Clevite.

16.     By 1958, Clevite employed approximately 200 individuals in its manufacturing operations at the Property.

17.     Between 1946 and 1958, Clevite manufactured 250 million automotive bearings and thin-walled bushings at the Property.

18.     In 1958, after 12 years of manufacturing at the Property, Clevite ceased its operations at the Property and began leasing the Property to other entities, including Magnavox.

19.     Upon taking possession of the Property for a second time, Magnavox commenced manufacturing operations in the onsite building manufacturing sonobuoys, military radios, and other electrical components.

20.     In 1960, Clevite merged into Gould, Inc.

21.     After the merger, Gould, Inc., continued to lease the Property to Magnavox which continued its manufacturing operations at the Property.

22.     Magnavox ceased its operations at the Property in 1968.

23.     Gould, Inc., continued to own the Property until 1976.

## DEFENDANTS ARE CORPORATE SUCCESSORS

24.     Raytheon and Pullman and/or Gould Electronics are the successors of the entities that operated at the Property.

**Raytheon is the successor of Magnavox**

25.    In 1974, Magnavox was acquired by North American Philips Development Company.

26.    As part of that acquisition, Magnavox's name was changed to Magnavox Government and Industrial Electronics Company.

27.    In 1991, Magnavox Government and Industrial Electronics Company was renamed Magnavox Electronic Systems Company.

28.    In 1993, North American Philips Development Company sold Magnavox Electronic Systems Company to The Carlyle Group.

29.    In 1995, Hughes Electronics purchased Magnavox Electronics Systems Company and renamed it Hughes Defense Communications.

30.    On December 11, 1996, Hughes Defense Communications was merged into MESC Holdings, Inc.

31.    On the same day, MESC Holdings, Inc., was merged with Hughes Aircraft Company.

32.    On December 16, 1997, Hughes Aircraft Company was merged with HE Holdings, Inc.

33.    In 1997, HE Holdings, Inc., was merged with Raytheon Company.

34.    On April 3, 2020, Raytheon Company merged with United Technologies to form Raytheon.

**Pullman and/or Gould Electronics is the successor of Gould, Inc.**

35.    In 1981, Gould, Inc., sold its Clevite division to the Reading Company.

36.    In 1987, the Clevite division, now called Clevite Industries, merged with and into the Pullman Company.

37.    In 1988, Gould, Inc., was acquired by Nippon Mining U.S. Inc., which subsequently reorganized Gould, Inc., into Gould Electronics, Inc.

38.    Upon information and belief, Pullman and/or Gould Electronics is the successor of Gould, Inc., and retains Gould, Inc.'s liabilities associated with its ownership of and operations at the Property.

**DEFENDANTS' OPERATIONS CAUSED
THE CONTAMINATION AT THE PROPERTY**

39.    The electronics, such as radios, radio-detection equipment, and sonobouys, manufactured by Raytheon at the Property required machining and the use of other heavy manufacturing machinery.

40.    As part of the manufacturing process, Raytheon required the use of hydraulic fluids, heat-transfer systems, lubricating oils, quench oils, cutting oils, and parts cleaners.

41.    Upon information and belief, during Raytheon's operations at the Property, Raytheon purchased, used, stored, and disposed of products containing the hazardous substances discovered at the Property.

42.    Automotive bushings and bearings, such as those manufactured by Gould, Inc., at the Property, required stamping, forming, molding, forging, and machining.

43.    As part of this manufacturing process, Gould, Inc., required the use of hydraulic fluids, heat-transfer systems, lubricating oils, quench oils, cutting oils, and parts cleaners.

44.    Upon information and belief, during Gould, Inc.'s operations at the Property, it purchased, used, stored, and disposed of products containing the hazardous substances discovered at the Property.

45.     For instance, Gould, Inc.'s patented process for making bimetallic strips for bearings included the use of a trichloroethylene ("TCE") vapor degreaser.

46.     Volatile organic compounds, including TCE, tetrachloroethene ("PCE"), and 1,1,1-trichloroethane ("1,1,1-TCA") (collectively "VOCs") were commonly used in electronics manufacturing, bearing manufacturing, machining, and parts-cleaning operations and were unregulated during the time of Raytheon's, and Pullman's and/or Gould Electronics' operations at the Property.

47.     Polychlorinated biphenyls compounds, including Aroclors 1248, 1254, and 1260 (collectively "PCBs"), were frequently used in electronic switches, electronic capacitors, electrical components, dialectic fluids, hydraulic fluids, heat-transfer systems, lubricating oils, quench oils, and cutting oils, and were unregulated during the time of Raytheon's and Pullman's and/or Gould Electronics' manufacturing operations at the Property.

## THE CONTAMINATION IMPACTING THE PROPERTY

48.     A June 21, 2006, Initial Site Screening Report prepared by SES Environmental found that groundwater at the Property contained concentrations of the VOCs exceeding applicable Indiana Department of Environmental Management ("IDEM") Remediation Closure Guide ("RCG") groundwater screening levels ("GWSLs"); the report also found PCBs, including Aroclors 1254 and 1260, at the Property in concentrations exceeding the 40 CFR 761.79 decontamination standard of 10 micrograms per 100 centimeters squared ("Federal Decontamination Standard"), ranging from 11.3 to 67 micrograms per 100 centimeters squared.

49.     Subsequent investigations confirmed significant VOC and PCB contamination at the Property.

50.     For example, an August 31, 2012, Initial Site Investigation Report by August Mack Environmental found soil samples containing a concentration of TCE exceeding the IDEM RCG Mitigation to Groundwater ("MTG") screening level; monitoring-well groundwater samples also contained VOCs exceeding the IDEM RCG GWSLs.

51.     In addition, a February 5, 2018, PCB Investigation Report found PCBs exceeding the Federal Decontamination Standard. Total PCBs were detected in the northern two-thirds of the on-site building at concentrations as high as 269,000 micrograms per 100 centimeters squared which is more than 26,900 times greater than the Federal Decontamination Standard. Further, PCB contamination was identified on painted surfaces (as high as 28 micrograms per 100 centimeters squared) and on the building's floor (as high as 610 micrograms per 100 centimeters squared). The floors of the building are so heavily contaminated with PCBs that 63% of surface samples collected from the dust and oil on the floor contained concentrations of PCBs exceeding 50,000 micrograms per kilogram, requiring that the media generated during the cleaning process be managed as a hazardous waste under the Toxic Substances Control Act.

52.     Approximately 40 percent of the PCB samples collected from the floor of the building contain concentrations of PCBs greater than 10,000 micrograms per kilogram with some samples as high as 430,000 micrograms per kilogram.  Under applicable federal standards, the floor in this portion of the building cannot be left in place and must be removed.

53.     Beneath the building, 17 of 18 sediment samples collected from onsite utilities in August and September 2017 contained concentrations of total PCBs exceeding 3 micrograms per kilogram (the discharge limit to a treatment facility) with some samples detected at concentrations as high as 84,000 micrograms per kilogram or more than 28,000 times greater than the discharge limit.

54.     Outside of the onsite building, a number of soil samples collected since August 2016 contained concentrations of PCBs exceeding the applicable IDEM RCG MTG screening levels for Aroclor 1248 (e.g., 240 micrograms per kilogram), Aroclor 1254 (e.g., 410 micrograms per kilogram), and Aroclor 1260 (e.g., 1,100 micrograms per kilogram); some of the samples contained concentrations of PCBs exceeding the IDEM RCG commercial direct contact screening level for Aroclor 1254 (e.g., 9,700 micrograms per kilogram) and Aroclor 1260 (e.g., 9,900 micrograms per kilogram) with the highest concentration of Aroclor 1254 registering at 47,000 micrograms per kilogram which is almost five times the direct contact standard.

55.     Since the contamination was discovered, Lea-Max has incurred, and will continue to incur, environmental response costs in responding to the contamination including costs necessary to remove and remediate the contamination.

56.     Lea-Max, by this action, seeks recovery of its past and future environmental response costs, incurred as a result of Raytheon's and Pullman's and/or Gould Electronics' contamination of the Property, and Lea-Max's attorneys' fees and court costs incurred in bringing this action.

### CLAIMS FOR RELIEF

### Count I
### Indiana Environmental Legal Action

57.     Lea-Max incorporates by reference paragraphs 1 through 56 above as though fully set forth herein.

58.     Section 13-30-9-2 of the ELA statute reads as follows:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or

contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

59.     Lea-Max, Raytheon, Pullman, and Gould Electronics are "persons" within the meaning of the ELA statute.

60.     Raytheon and Pullman and/or Gould Electronics caused and contributed to the release of hazardous substances into the subsurface soil and groundwater at and around the Property.

61.     The subsurface soil and groundwater contamination at and around the Property poses a risk to human health and the environment.

62.     Through the work conducted at and around the Property by and on behalf of Lea-Max, it has incurred and will continue to incur environmental response costs associated with Raytheon's and Pullman's and/or Gould Electronics' contamination of the Property.

63.     Raytheon and Pullman and/or Gould Electronics are liable to Lea-Max for all costs Lea-Max has incurred and will incur as a result of the subsurface soil and groundwater contamination at and around the Property, as well as the attorneys' fees and court costs incurred by Lea-Max in bringing this action.

## Count II
## Comprehensive Environmental Response, Compensation, and Liability Act

64.     Lea-Max incorporates by reference paragraphs 1 through 63 above as though fully set forth herein.

65.     42 U.S.C. § 9607(a)(4)(B), commonly referred to as CERCLA Section 107, reads as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-
>
> (1)     the owner and operator of a vessel or a facility,

(2)  any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3)  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other part or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4)  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for-

(A)  all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B)  any other necessary costs of response incurred by any other person consistent with the national contingency plan (…)

66.    42 U.S.C. § 9601(9) reads as follows: "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline … or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

67.    40 CFR § 304.12 (m) reads as follows: "Potentially responsible party or PRP means any person who may be liable pursuant to section 107(a) of CERCLA, 42 U.S.C. 9607(a), for response costs incurred and to be incurred … not inconsistent with NCP."

68.    The Property which is the subject of this action is a "facility" as defined under CERCLA.

69.    Raytheon and Pullman and/or Gould Electronics caused and contributed to the release of hazardous substances into the subsurface soil and groundwater at and around the Property and, therefore, are Potentially Responsible Parties as defined in 40 CFR § 304.12(m).

70.    Pullman and/or Gould Electronics were owners of the Property at a time of disposal of hazardous substances at the Property and, therefore, are Potentially Responsible Parties as defined in 40 CFR § 304.12(m).

71.    Through the work conducted at and around the Property by and on behalf of Lea-Max, it has incurred and will continue to incur environmental remediation and response costs that are consistent with the National Contingency Plan.

72.    Raytheon and Pullman and/or Gould Electronics are jointly and severally liable to Lea-Max for all costs Lea-Max has incurred and will incur as a result of the subsurface soil and groundwater contamination at and around the Property.

**Count III**
**Negligence**

73.    Lea-Max incorporates by reference paragraphs 1 through 72 above as though fully set forth herein.

74.    Raytheon and Pullman and/or Gould Electronics had a duty to not allow hazardous substances to be released into the environment, including, but not limited to, onto onsite structures, and to promptly respond to any release of such hazardous substances in a manner that would remove the dangers created by the release of the hazardous substances.

75.    Raytheon and Pullman and/or Gould Electronics breached these duties by their negligent acts and omissions in operating and maintaining the Property, by their failure to implement safeguards to assure against the release of hazardous substances, and by their failure to promptly and effectively address the release of hazardous substances at the Property.

76.    Raytheon and Pullman and/or Gould Electronics knew or should have known that the release of hazardous substances at the Property had the potential to cause harm to human health and the environment.

77.     As a direct and proximate result of Raytheon's and Pullman's and/or Gould Electronics' breaches of their duties, Lea-Max has suffered and continues to suffer damages.

78.     Raytheon and Pullman and/or Gould Electronics are liable to Lea-Max for all costs Lea-Max has incurred and will incur as a result of the contamination at and around the Property.

## Count IV
## Negligence Per Se

79.     Lea-Max incorporates by reference paragraphs 1 through 78 above as though fully set forth herein.

80.     The release of hazardous substances at the Property by Raytheon and Pullman and/or Gould Electronics and Raytheon's and Pullman's and/or Gould Electronics' failure to properly address their release of hazardous substances at the Property constitute an unexcused and unjustified violation of a duty prescribed by statute, regulation, or ordinance including, but not limited to, a violation of the ELA, CERCLA, and the Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq*.

81.     The breaches by Raytheon and Pullman and/or Gould Electronics of duties prescribed by statute, regulation, and ordinance, as described, but not limited to, the above-referenced statutes, are the proximate cause of injury to Lea-Max.

82.     The violations of, but not limited to, the above-referenced statutes impose liability upon Raytheon and Pullman and/or Gould Electronics.

83.     Raytheon and Pullman and/or Gould Electronics are liable to Lea-Max for all costs Lea-Max has incurred and will incur as a result of the contamination at and around the Property.

## Prayer for Relief

WHEREFORE, Lea-Max respectfully requests that the Court:

1.    Enter judgment in favor of Lea-Max and against Raytheon and Pullman and/or Gould Electronics;

2.    Order Raytheon and Pullman and/or Gould Electronics to pay Lea-Max an amount that will fully and fairly compensate Lea-Max for its past and prospective damages;

3.    Order Raytheon and Pullman and/or Gould Electronics to pay Lea-Max for its reasonable attorneys' fees and court costs incurred in bringing this action;

4.    Declare that Raytheon and Pullman and/or Gould Electronics are obligated to pay all costs, damages, fees, and other expenses incurred and to be incurred by Lea-Max arising from the environmental contamination at and emanating from the Property;

5.    Award Lea-Max all further relief that is just and proper including prejudgment interest at Indiana's statutory rate of eight percent on all covered, but unreimbursed, past costs.

## JURY DEMAND

Lea-Max, pursuant to Federal Rule of Civil Procedure 38(b), respectfully submits this demand for trial by jury on all issues so triable.

Respectfully submitted,


 /s/David L. Guevara
David L. Guevara, Atty. No. 26388-49
John F. Huldin, Atty. No. 35258-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
Email: dguevara@taftlaw.com
        jhuldin@taftlaw.com

*Counsel for Plaintiff*

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Lea-Max Corporation | Raytheon Technologies Corporation, The Pullman Corporation, and Gould Electronics, Inc. |

**(b)** County of Residence of First Listed Plaintiff   Marion County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Arlington County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Taft Stettinius & Hollister LLP
One Indiana Square, Ste. 3500
Indianapolis, IN 46204   T- (317) 713-3500

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☒ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 9607(a)
Brief description of cause:
Cost recovery action against responsible parties.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____